IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-01198-MEH

MICHELLE L. VASQUEZ,

      Plaintiff,

v.

CAROLYN W. COLVIN, Commissioner of Social Security,

      Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**.

Plaintiff, Margaret E. Perez, appeals from the Social Security Administration ("SSA") Commissioner's final decision denying her application for disability and disability insurance benefits ("DIB"), filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401-433, and her application for supplemental security income benefits ("SSI"), filed pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383c. Jurisdiction is proper under 42 U.S.C. § 405(g). The parties have not requested oral argument and the Court finds it would not materially assist the Court in its determination of this appeal. After consideration of the parties' briefs and the administrative record, the Court **REVERSES AND REMANDS** the Commissioner's final order.

## I. STATEMENT OF THE CASE

Plaintiff seeks judicial review of the Commissioner's decision denying her applications for DIB [Administrative Record ("AR") 148-149] and for SSI [AR 150-154] filed on July 21, 2011.

After the application was initially denied on August 31, 2011 [AR 72-75], an Administrative Law Judge ("ALJ") scheduled a hearing upon the Plaintiff's request for October 2, 2012 [AR 90-96]. Although Plaintiff and a vocational expert were scheduled to testify at the hearing, the ALJ determined he needed to secure additional evidence from a physical examination of the Plaintiff to which the parties did not object. [AR 40-44] Plaintiff underwent the examination and the ALJ rescheduled the hearing for March 11, 2013. [AR 117-122] A vocational expert, Bruce Magnuson, testified at the hearing. [AR 28-37]  The ALJ issued a written ruling on March 20, 2013 finding Plaintiff was not disabled since April 30, 2011, because considering Plaintiff's age, education, work experience and residual functional capacity, Plaintiff could perform her past relevant work as a mail handler, mail carrier, school bus driver, and data entry clerk .  [AR 17-22]  The SSA Appeals Council subsequently denied Plaintiff's administrative request for review of the ALJ's determination, making the SSA Commissioner's denial final for the purpose of judicial review [AR 1-5].  *See* 20 C.F.R. § 416.1481.  Plaintiff timely filed her complaint with this Court seeking review of the Commissioner's final decision.

## II. BACKGROUND

Plaintiff was born on December 23, 1962; she was 48 years old when she filed her applications for disability and supplemental security income benefits on July 21, 2011.  [AR 148-156] Plaintiff claims she became disabled on April 30, 2011 [*id.*] and reported that she was limited in her ability to work by "diabetes, neuropathy, and back pain."  [AR 186]  Plaintiff asserts she "cannot walk, drive or sit[;] [her] whole right side is in constant pain from [the] waist down[;] right foot is numb. Also I have diabetic neuropathy in my feet[;] cannot feel gas and break [sic]."  [AR

200] According to her application, Plaintiff's last day of work was April 30, 2011, because "of her condition(s)." [AR 186]   Plaintiff states that she takes three medications for her diabetes and neuropathy, two medications for her pain, one medication for anxiety and one medication for blood pressure.  [AR 189]

Plaintiff's work history included a bank check encoder from 1994 to 1999, a school bus driver from February 1999 to June 1999, and a mail handler/carrier from September 1999 - April 2011.  [AR 187, 196]  Her earnings ranged from $8,269.36 to $19,761.70 during the period 1996-1999, and from $29,075.48 to $38,812.77 during the period 2000-2010; Plaintiff earned $16,870.74 in 2011.  [AR 176]

Plaintiff provides copies of medical records dating back to May 2010; however, like the ALJ, the Court will review only those records concerning the identified disabilities for the relevant time period.  A medical record from May 19, 2010 reflects that Plaintiff was seen for an office visit at Kaiser Permanente where Dr. Foley diagnosed Plaintiff with sciatica; diabetic neuropathy, peripheral; smoker and hypertension. [AR 276-281] Dr. Foley noted that Plaintiff also had the following relevant "active problems": radiculopathy lumbar; history of medical noncompliance; hyperlipidemia; diabetes mellitus (DM) 2, uncontrolled; depression, major, recurrent.  [AR 278] The doctor prescribed Cyclobenzaprine and Hydrocodone for Plaintiff's sciatic pain. [AR 276]

On October 12, 2010, Plaintiff presented to Dr. Schlicht of Lakewood Family Medicine (Kaiser) apparently for an initial visit and management of medication.  Dr. Schlicht diagnosed Plaintiff with DM2 with diabetic peripheral neuropathy; hyperlipidemia; sciatica; anxiety disorder; thyroid nodule; and DM2 with diabetic chronic kidney disease. [AR 266-272] Dr. Schlicht advised

Plaintiff to stop taking numerous medications and prescribed Glipizide and Meformin for diabetes; Gabapentin for neuropathy; Hydrocodone for sciatic pain; Lisinopril for hypertension; Simvastatin for cholesterol; and Alprazolam for anxiety. [AR 267-268] In addition, the record indicates that Plaintiff takes a "medical marijuana pill at night for neuropathy" prescribed by an "outside provider." [AR 269-270]

Three days later, a physician's assistant (PA) noted, and notified Plaintiff, that her blood test results indicated chronic kidney disease, stage 3, and that her A1C and blood pressure results were "not at goal." [AR 262-265] The PA also noted that "pt has been noncompliant and getting some prescriptions filled outside of KP ... (obtaining Xanax, Glipizide, Metformin and Lisinopril externally)." [AR 263] Then, on November 3, 2010, the PA described a telephone call with Plaintiff in which she reported low blood pressure the previous day, but was feeling better after stopping "HCTZ" medication; Plaintiff stated "it could be that her pain had caused the elevated b/p and now that her pain has improved, her b/p has improved." [AR 249]

On January 12, 2011, Plaintiff reported to Dr. McGrath at Kaiser that she was suffering depression; she "lost her daughter 8 weeks ago" due to a heart transplant failure. [AR 244] The doctor gave Plaintiff some suggestions for support groups and prescribed Sertraline for the depression. [AR 243-247] Plaintiff saw a counselor on January 18, 2011, who educated Plaintiff on self care and support groups. [AR 240-242] Plaintiff again spoke with the counselor on January 26, 2011 saying that she had returned to work and met with an "EAP" therapist for continuing care. [AR 238]

Plaintiff next saw Dr. McCaffrey at Kaiser for a "follow up" appointment on April 18, 2011;

Plaintiff complained about swelling in her feet for the past three days, noted that she "walks a lot" as a mail carrier, and "mention[ed] some sciatica of the right leg." [AR 234-237] The doctor noted that Plaintiff's diabetic neuropathy and chronic kidney disease were stable and that he would adjust her Lisinopril to relieve any resulting edema. [AR 234]

Plaintiff saw Dr. McCaffrey again on May 13, 2011 for another follow-up regarding Plaintiff's diabetes and chronic back pain. [AR 225-229] Plaintiff reported that her chiropractor suggested she see a surgeon regarding her back pain and herniated disc. [AR 227] In addition, Plaintiff conceded that her diabetes was not under control "due to her admitted poor compliance." [*Id.*] Dr. McCaffrey referred Plaintiff to "Physical Medicine" for her back pain and neuropathy. [AR 227-228]

On May 24, 2011, Plaintiff saw Joseph Illig, M.D. for "low back pain." [AR 365-366] Dr. Illig assessed Plaintiff with lumbosacral radiculopathy, found a "right S1 radiculopathy" and determined that due to the degree and magnitude of compression, conservative treatment would not be beneficial and may aggravate her diabetes, so suggested "surgical intervention" in the form of a "microlumbar discectomy." [*Id.*] Plaintiff agreed to proceed with the surgery. [*Id.*]

Plaintiff met with Dr. Illig again on June 10, 2011 to discuss lab results and a pre-operative course of action. [AR 363-364] The doctor changed his finding to a "right L5 radiculopathy" and noted that he discussed with Plaintiff the implications as to her work as a mail carrier, saying that "she may not be able to pursue her present position"; Plaintiff then asked about Social Security disability and Dr. Illig responded, "I indicated quite frankly that total disability from a microlumbar discectomy is not likely." [AR 364]   The doctor proceeded with surgery on June 13, 2011

5

confirming what the MRI showed as "subligamentous herniation L4, L5 on the right compressing the L5 root" and noting that after the procedure, "the L5 root was nicely decompressed and pulsatile." [AR 317-318] Plaintiff was discharged the next morning on a regular diet and activity "as tolerated" with no bending, twisting or lifting.  [AR 310-311]

Plaintiff followed up with Dr. Illig on June 20, 2011 reporting that her right leg pain (sciatica) and buttock and hamstring pain were better since the surgery, but she still had some "right lumbar sacral paraspinal" pain. [AR 362] Dr. Illig noted that the post operative course was "satisfactory." [*Id.*]  Then, on July 18, 2011, Dr. Illig noted "some L5 radicular irritation" and advised Plaintiff to start physical therapy, including pool exercises. [AR 361]

Plaintiff filed the present applications for DIB and supplemental security income benefits on July 21, 2011. [AR 148-156]  Plaintiff claims that she stopped work on April 30, 2011 due to her diabetes, neuropathy, and back pain. [AR 186]

Plaintiff called a nurse at Kaiser on August 2, 2011 complaining of "back pain/hip pain"; the nurse set an appointment the following day. [AR 383-384]  Plaintiff then saw Richard Stiphout, M.D. on August 3, 2011 to whom she reported a recurrence of sciatica "just like before" and stated that she was "using a cane to get around - helps decr[ease] the pain." [AR 386-390] Plaintiff also noted "issues" with diabetic neuropathy and depression. [AR 389]  Dr. Stiphout adjusted Plaintiff's Gabapentin medication and added Percocet for acute pain. [AR 390]

Plaintiff saw Dr. Illig for a follow up appointment on August 11, 2011 complaining of continued pain in her right leg, buttocks and back [AR 485-486] Dr. Illig noted a "possible recurrent disc herniation" and ordered an MRI; the doctor also prescribed Vicodin for Plaintiff's pain. [*Id.*]

The MRI taken on August 22, 2011 reflects "postoperative changes of L5-S1 without evidence of recurrent disk herniation or stenosis." [AR 487]

On August 22, 2011, Plaintiff completed a Personal Pain Questionnaire and a Function (activities) Report for SSA Disability Determination Services. [AR 199-208] Plaintiff reported that she had constant sharp pain in her back and right leg; her right foot was numb; she could not walk more than 10 feet or sit for longer than 30 minutes; she could not go anywhere or stand long enough to cook or clean; and she took Vicodin which did not alleviate the pain. [AR 199] Plaintiff also reported for her daily activities that she "sit[s] for about ½ hour then I have to lay down for about ½ hour[;] I try to walk for about ½ hour throughout the day"; she got only about six hours of "broken" sleep; her boyfriend helped her with personal care; she cooked meals such as soup and frozen dinners because she could not stand long enough for a regular meal; she sat on the porch outside about ½ hour per day; she could no longer drive because of back pain and numbness in her right foot; she was able to clean the dishes and shop for groceries once per month; she was able to watch television "all day" if she could "sit comfortab[ly]"; she could talk on the telephone with others every other day, but did not go out to visit family and friends and could do nothing with them when they visited her; she could walk for 5-10 minutes with a cane; and she used the cane for stability and a wheelchair when she attended a graduation. [AR 200-208]

On August 31, 2011, the SSA sent to Plaintiff a Notice of Disapproved Claim informing her that her claims for DIB and SSI were denied. [AR 72-75]

On September 6, 2011, Plaintiff returned to Dr. Illig for a follow up appointment post surgery; she reported having continued pain in her back, right buttock and thigh, and that she was

"dealing with a lot of stressful issues" including the death of her daughter, hospitalization of her

father, and fight with her boyfriend.  [AR 483] Dr. Illig assessed "residual L5 radicular symptoms"

noting that Plaintiff had "a considerable amount of factors increasing stress levels which contribute

to her somatic pain, I suspect." [AR 483-484] He discussed the MRI's negative finding, prescribed

pain medication, advised Plaintiff to "use a pool" for exercises, and "sent a note indicating she is

unable to return to work at his point given her continued pain." [*Id.*]

On September 19, 2011, a nurse from Kaiser called Plaintiff asking her to come in for fasting

lab work so that the doctor could continue to refill her medication; Plaintiff responded that she did

not know when she could come in, since she lived in Walsenberg. [AR 402-403] Plaintiff then

presented to Dr. McGrath on October 4, 2011 complaining of low back pain and worsening

neuropathy in both feet; she reported that she had been taking her Gabapentin regularly but not her

diabetes medication. [AR 407-412] Dr. McGrath increased the dosage of Gabapentin and discussed

Plaintiff's history of noncompliance with her course of medication. [AR 410]

Plaintiff returned to Dr. Illig on October 10, 2011 for a post surgery follow up appointment;

she reported the same pain and "stressful issues" as those reported in September and stated that she

was tolerating the pain medication well. [AR 481-482] Dr. Illig found Plaintiff was walking more

and felt some slight improvement since last month, but she was not able to return to work "at this

point"; the doctor "changed" Plaintiff (referred her back) to her primary care physician. [AR 482]

On October 12, 2011, Dr. Whalen (who counseled Plaintiff previously in January) called the

Plaintiff to follow up regarding Plaintiff's depression; Plaintiff reported her stressors and that she

"hurt back and has been unable to work since April"; she also reported that she was having trouble

paying copays for her medication. [AR 414-415] Dr. Whalen suggested certain financial programs and recommended Plaintiff keep regular contact with her family and friends. [*Id.*; AR 418] Plaintiff also spoke with Dr. McGrath about completing forms to get medications for free. [AR 424]

On October 18, 2011, Plaintiff completed an Appointment of Representative form, which identifies Michael Seckar as her attorney [AR 77] and a Request for Hearing by Administrative Law Judge form [AR 78-79]. On October 20, 2011, Dr. McGrath noted that she reviewed Dr. Illig's records and determined "there is not much else to do besides treat it with medications," and "we need to give the new medication some time to kick in." [AR 433] On October 25, 2011, Plaintiff spoke with Dr. Whalen again by telephone reporting frustration with needing to see physicians in Denver, but stating that she did not want to transfer care to Pueblo because she "saw 2 different doctors there and had a bad experience." [AR 441]

On November 2, 2011, Plaintiff saw C. David Neece as a new patient and reported the onset of back problems that year while working as a letter carrier; she stated that she was "on medical leave" since 5/1/11 and "now has constant back pain." [AR 510] Dr. Neece assessed Plaintiff as follows: lumbar herniated disc and radiculopathy; type 2 diabetes mellitus "fair control"; hypertension "good control"; diabetic neuropathy; depression; and GERD. [*Id.*] Dr. Neece completed a Med-9 form stating that he believed Plaintiff would be disabled for 6 months from the onset of her disability on 5/1/11. [AR 491]

On November 3, 2011, the Office of Disability Adjudication and Review (ODAR) sent Plaintiff and her counsel a letter confirming receipt of the request for hearing, informing Plaintiff of hearing procedures and explaining that a Notice of Hearing will be sent at least 20 days before

the hearing notifying him of the time and place.  [AR 80-81]

Plaintiff next saw Dr. Neece on March 2, 2012 for a "check up" and reported she had "muscle spasms across her abdomen." [AR 509] Dr. Neece adjusted Plaintiff's medication for her diabetes and referred her to a podiatrist for the neuropathy. [*Id.*] Dr. Neece also completed a Med-9 form stating that he believed Plaintiff would be disabled for 6 months. [AR 489] Plaintiff returned to see Dr. Neece on March 19, 2012 reporting a "rapid pulse." [AR 508] Dr. Neece found, *inter alia*, that Plaintiff "amb[ulated] well without assistance," and he discussed a "low fat diet and exercise" regarding her hypertension, the "importance of good BG [blood glucose] control" for her diabetic neuropathy," and cessation of her smoking. [*Id.*] Plaintiff saw Dr. Neece again on April 2, 2012 reporting she was dizzy "a couple of nights ago" when her blood pressure was 99/60. [AR 507] The doctor discussed insulin for Plaintiff's rising blood sugar levels, but "she doesn't want it." [*Id.*]

Plaintiff returned to Dr. Neece on May 24, 2012 "need[ing] paperwork done" and reporting seeing shadows in her left eye with no pain but some blurriness. [AR 505] The doctor ordered labs for her diabetes and hypertension and advised rest, physical therapy and no lifting for Plaintiff's lower back pain. [*Id.*] Plaintiff saw Dr. Neece again on June 13, 2012 reporting that insurance would not cover medications for depression and diabetes. [AR 504] The doctor noted that Plaintiff had tried to control her blood glucose on current medications and she lost weight, but BG "still running high"; he determined that if her attempts to get medications through insurance "totally fails she will have to go on insulin." [*Id.*]

On July 19, 2012, the ODAR sent Plaintiff a Notice of Hearing informing the Plaintiff that the hearing would occur on October 2, 2012 in Pueblo, Colorado. [AR 90-96] A representative of

Fastrak Rehabilitation Services was requested to appear as a vocational expert at the hearing. [AR 108-109]

Plaintiff presented to Spanish Peaks Behavioral Heath Center ("SPBHC") on July 31, 2012 for an "initial emergency assessment." [AR 513-518] She reported to a therapist, Michelle Morrissey, that she had suffered depression since childhood and it got worse in 2003 after she learned her husband had cheated; she suffered anxiety since 2006 when her husband asked for a divorce; she had gotten "hurt at work and had to have back surgery ... [d]ue to diabetes I didn't heal the way the doctor expected"; and she had not "really grieved" for her daughter or father and was not "dealing with [her] son's issues" because she was "kind of in a zone." [AR 513] She denied suicidal ideation and hallucinations but felt hopeless that things would get better, and reported issues with her short-term memory and concentration. [AR 516-517] The therapist diagnosed Plaintiff with general anxiety disorder and major depressive disorder, recurrent, moderate, and assessed her a global assessment functioning (GAF) score of 53.[1]

---

[1]In *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012), the Tenth Circuit describes the GAF as follows:
The GAF is a 100-point scale divided into ten numerical ranges, which permits clinicians to assign a single ranged score to a person's psychological, social, and occupational functioning. See American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32, 34 (Text Revision 4th ed. 2000). GAF scores are situated along the following "hypothetical continuum of mental health [and] illness":
• 91–100: "Superior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities. No symptoms."
• 81–90: "Absent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument with family members)."
• 71–80: "If symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in

Plaintiff saw Ms. Morrissey again on August 9, 2012 and reported that her son was not doing well in ICU following an auto accident; she was at the hospital in Denver four days a week; agreed to therapy weekly for 50 minutes each. [AR 511]  Plaintiff also saw a podiatrist, Dr. Gordon Rheaume, on August 9, 2012 and was fitted for "diabetic shoes." [AR 493-495, 497] Plaintiff returned to see Ms. Morrissey on September 5, 2012 at which time they discussed methods to help Plaintiff relax and sleep better so to allow Plaintiff to deal with her needs and son's long-term care. [AR 511]

---

social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)."
• 61–70: "Some mild symptoms (e.g., depressed mood and mild insomnia), OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."
• 51–60: "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."
• 41–50: "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."
• 31–40: "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child beats up younger children, is defiant at home, and is failing at school)."
• 21–30: "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)."
• 11–20: "Some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute)."
• 1–10: "Persistent danger of severely hurting self or others (e.g., recurrent violence) OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death."
• 0: "Inadequate information."

She then saw Dr. Neece on September 5, 2012 complaining of a lump in her abdomen and knee pain; the doctor discussed Plaintiff's constipation and ordered a "CT when she can"; he also noted discussing with Plaintiff her "disability paperwork." [AR 503] That same day, Dr. Neece completed a Mental RFC Evaluation in which he noted that he had provided Plaintiff mental health treatment since May 2012 and diagnosed Plaintiff with depression and anxiety. [AR 498-500] After listing none to marked limitations in certain areas, the doctor estimated Plaintiff would be "off task" for 30% of a work week and she has suffered her impairments since 2008. [*Id.*] Dr. Neece also completed a physical RFC evaluation in which he found Plaintiff could lift and carry 10 pounds; sit for 30 minutes at a time during a 10-hour day; stand for one hour during an 8-hour day; elevate her feet for 15 minutes every 2-3 hours; and lie down for 15 minutes every 2 hours. [AR 501-502]

The records indicate Plaintiff met with Ms. Morrissey approximately twice per month from September 2012 through January 2013 and primarily discussed the issues Plaintiff encountered in caring for and finding caregiving assistance for her son; in the last record dated January 29, 2013, Ms. Morrissey described Plaintiff's progress as: "Michelle has looked into services for her son, she has made appts for in-home care, long term care, SSI, divorce, etc. She has accepted the help of case mgr to assist her and son with SSI and other needs. She has someone coming over Thursday to talk about son's in-home care needs." [AR 541-546]

Meanwhile, Plaintiff returned to Dr. Neece on October 1, 2012 for a follow up after blood work (A1C), but the doctor's notes are mostly illegible; however, he notes that Plaintiff had been "off Metformin due to renal function and states she hasn't been using the [illegible] and she lost her BG meter." [AR 567]

The following day, on October 2, 2012, Plaintiff and her counsel, Michael Seckar, appeared for the disability benefits hearing, and the ALJ opened the proceeding stating his concerns about the reliability of Dr. Neece's inconsistent findings and the inconsistencies he perceived in the record. [AR 40-44] The ALJ determined "when I've got a conflict in the evidence, it really is incumbent upon me to take reasonable steps to clarify the inconsistency," and continued the hearing pending a consultative physical examination.  [AR 44]  Plaintiff did not object. [*Id.*]

Plaintiff presented to the consultative examiner, Adam Summerlin, M.D., on October 20, 2012 complaining chiefly of back pain and diabetic neuropathy. [AR 522-527] After noting certain medical findings in the record, Dr. Summerlin noted Plaintiff's reports that she experienced "some improvement in the pain" radiating into her right leg, though she continued to have back pain, particularly in cold weather or when walking for a long time period; the pain and burning from neuropathy in Plaintiff's feet had moved up to her knees and she suffered a mild imbalance from numbness in her feet; she was currently caring for her son who suffered injuries from a crash; and she recently lost her father and daughter. [AR 523-524] Dr. Summerlin found Plaintiff "independent in her self-care" and able to cook, clean, crochet and drive short distances, and she sat comfortably on the examination table and got on and off without assistance.  [*Id.*]  After a thorough physical examination, Dr. Summerlin diagnosed Plaintiff with diabetic neuropathy and a lumbar strain without definite radiculopathy, and completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) form reflecting his opinion that Plaintiff can lift up to 20 pounds continuously and up to 100 pounds occasionally; carry up to 20 pounds continuously, up to 50 pounds frequently and up to 100 pounds occasionally; sit, stand and walk for 4 hours at a time in an

8-hour day; ambulate without assistance; use both hands continuously; operate foot controls frequently; climb, balance, stoop, kneel and crawl only occasionally, but crouch frequently; tolerate unprotected heights and loud noise frequently; operate a motor vehicle frequently; and shop, travel, ambulate, walk on uneven surfaces, use public transportation, climb a few steps, prepare a simple meal and feed herself without assistance. [AR 525-533]

Plaintiff returned to Dr. Neece on November 19, 2012 complaining of a swelling in her abdomen and asking for completion of paperwork. [AR 563] The doctor's notes are mostly illegible but he notes Plaintiff continues to have "back pain and right leg and she cont[inues] to struggle with blood sugars." [*Id.*] Dr. Neece completed another Med-9 form that day opining that Plaintiff would be disabled for a period of six months. [AR 564-565] Plaintiff saw Dr. Neece again on December 10, 2012 following up her A1C labs, but the doctor's notes are mostly illegible. [AR 562]

The Court notes a Progress Record from January 8, 2013 completed by who appears to be the podiatrist, Dr. Rheaume, but whose writing is mostly illegible.  [AR 538]  Plaintiff saw Dr. Neece again on January 16, 2012 because she "need[ed] paperwork filled out," and the doctor's notes are mostly illegible.  [AR 561]  A questionnaire provided to Dr. Neece from Plaintiff's counsel is dated January 8, 2013, but completed by the doctor that day (January 16, 2013), and reflects the doctor's opinions that Plaintiff could lift only 10 pounds due to a "herniated disc"; she needed to elevate her feet 2-3 times per day for 15-30 minutes each time due to "right leg and foot swells" in order to reduce swelling and improve circulation and sensation; and she needed to lie down for 15 minutes every 2 hours due to "herniated disc and [illegible] pain" to reduce the pain and muscle spasms. [AR 539-540] Further, Dr. Neece clarified that he had identified her limitations beginning

15

in 2002 when she first reported a herniated disc, she was on light duty for two years and reported frequent recurrent back pain and sciatica. [*Id.*] Dr. Neece opined that Plaintiff was unable to work starting in March 2011 but his opinion as to whether he believed Plaintiff was capable of full-time work was illegible. [*Id.*]

On February 6, 2013, the ODAR issued a notice of the second hearing to be held March 11, 2013 in Pueblo, Colorado. [AR 117-122] The ODAR requested that Bruce Magnuson appear and give testimony as a vocational expert at the hearing. [AR 135] Plaintiff executed an Acknowledgment of Receipt of the Notice of Hearing on February 13, 2013. [AR 147]

A questionnaire completed and dated March 8, 2013 by Gordon Rheume, OPM reflects that he was currently treating Plaintiff for diabetic neuropathy and he opined that Plaintiff could stand for 1-2 hours during a day for 30 minutes at a time, based upon Plaintiff's complaints that she could not "stand or walk long distances; hard to feel gas and brake pedals to drive." [AR 568] In addition, an undated report by Dr. Neece reflects a history of Plaintiff's herniated disc, back pain, diabetic neuropathy and depression and concludes the following:

> 4. Assessment to degree of medical condition. Patient has difficulty driving due to neuropathies, numbness, tingling in her feet, has difficulty standing which effects [sic] ADL's [activities of daily living]. She has difficulty fixing meals, unable to do dishes. She uses a bench for showering. She has difficulty with steps in her home. She has difficulty doing laundry, she does multiple small loads in order to be able to carry the laundry. She frequently has to sit down throughout the day.

> 5. Restrictions. She has driving restrictions due to her neuropathies, inability to operate gas and brake pedal. She has [a] restriction in lifting 5 pounds repeatedly, by 10 pounds at once. She is not expected to recovery [sic] from this. Diabetic neuropathies are permanent prior to be [sic] total and completely disabled from being able to resume previous work requirements.

[AR 569-570]

The Plaintiff, her counsel and Mr. Magnuson appeared at the hearing on March 11, 2013. [AR 28] The Plaintiff testified that she could no longer perform the duties of her previous work as a bus driver, check encoder, mail handler and mail carrier because she "can't concentrate." [AR 34-35]  Mr. Magnuson then testified that a hypothetical employee – same age (48), education (GED) and work experience as the Plaintiff, who could stand or walk up to six hours; sit six hours; could lift 50 pounds occasionally, 25 pounds frequently; only occasionally climb, balance, stoop, kneel, crouch, or crawl; and they need to avoid exposure to heights on more than an occasional basis – could perform Plaintiff's past work activities. [AR 35]  When asked whether the employee would be "off task 30 percent of the time in any given workday," Mr. Magnuson testified that the employee could perform none of Plaintiff's past work activities.  [*Id.*] Further, the ALJ took judicial notice that a person able only to stand and/or walk for 30 minutes at a time for 2 hours per day could perform only sedentary work. [AR 36] Mr. Magnuson also testified that a person who needed to elevate his/her feet 2-3 times per day for 15 minutes at a time at unpredictable intervals could not work, but a person who could do so during normal breaks could work. [*Id.*]

The ALJ issued an unfavorable decision on March 20, 2013. [AR 12-23]

### III. LAW

To qualify for benefits under sections 216(I) and 223 of the SSA, an individual must meet the insured status requirements of these sections, be under age 65, file an application for DIB and/or SSI for a period of disability, and be "disabled" as defined by the SSA.  42 U.S.C. §§ 416(I), 423, 1382. Additionally, SSI requires that an individual meet income, resource, and other relevant

requirements. *See* 42 U.S.C. § 1382.

Here, the Court will review the ALJ's application of the five-step sequential evaluation process used to determine whether an adult claimant is "disabled" under Title II and Title XVI of the Social Security Act, which is generally defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

Step One determines whether the claimant is presently engaged in substantial gainful activity. If he is, disability benefits are denied. *See* 20 C.F.R. §§ 404.1520, 416.920. Step Two is a determination of whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. §§ 404.1520(c), 416.920(c). If the claimant is unable to show that his impairment(s) would have more than a minimal effect on his ability to do basic work activities, he is not eligible for disability benefits. *See* 20 C.F.R. 404.1520(c). Step Three determines whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). If the impairment is not listed, he is not presumed to be conclusively disabled. Step Four then requires the claimant to show that his impairment(s) and assessed residual functional capacity ("RFC") prevent her from performing work that he has performed in the past. If the claimant is able to perform his previous work, the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520(e), (f), 416.920(e) & (f). Finally, if the claimant establishes a *prima facie* case of

18

disability based on the four steps as discussed, the analysis proceeds to Step Five where the SSA Commissioner has the burden to demonstrate that the claimant has the RFC to perform other work in the national economy in view of his age, education and work experience. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).

## IV. ALJ's RULING

The ALJ ruled that Plaintiff had not engaged in substantial gainful activity since the onset date of her disability, April 30, 2011 (Step One). [AR 17] Further, the ALJ determined that Plaintiff had the following severe impairments – diabetes mellitus, neuropathy, and disorders of the spine – and determined that her depression was situational and not severe (Step Two). [AR 17-18] Next, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment deemed to be so severe as to preclude substantial gainful employment (Step Three). [AR 18]

The ALJ then determined that Plaintiff had the RFC to perform "medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except the claimant can stand and walk up to six hours per eight-hour workday; she can sit up to six hours per eight-hour workday; she can frequently lift and carry 25 pounds and occasionally 50 pounds; she can occasionally climb, balance, stoop, kneel, crouch and crawl; she should avoid more than occasional exposure to unprotected heights." [AR 18-22] The ALJ determined that the record reflects Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." [AR 19] He further gave some weight to Plaintiff's podiatrist's opinion, no weight to

Plaintiff's primary care physician's opinions (primarily due to perceived inconsistencies in the physician's reports), and great weight to the consultative examiner's opinion. [AR 19-22]

The ALJ went on to determine that considering Plaintiff's age, education, work experience and residual functional capacity, Plaintiff could perform her past relevant work as a mail handler, mail carrier, school bus driver, and data entry clerk (Step Four). [AR 22] As a result, the ALJ concluded that Plaintiff was not disabled at Step Four of the sequential process and, therefore, was not under a disability as defined by the SSA. [*Id.*]

Plaintiff sought review of the ALJ's decision by the Appeals Council on April 15, 2013. [AR 6] On April 14, 2014, the Appeals Council notified Plaintiff that it had determined it had "no reason" under the rules to review the decision and, thus, the ALJ's decision "is the final decision of the Commissioner of Social Security." [AR 1-3] Plaintiff timely filed her Complaint in this matter on April 29, 2014.

## V. STANDARD OF REVIEW

This Court's review is limited to whether the final decision is supported by substantial evidence in the record as a whole and whether the correct legal standards were applied. *See Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003); *see also White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001). Thus, the function of the Court's review is "to determine whether the findings of fact ... are based upon substantial evidence and inferences reasonably drawn therefrom. If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970). "Substantial evidence is more than a scintilla, but less than a preponderance; it is such evidence that a reasonable mind might accept

to support the conclusion." *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987) (citing

*Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  The Court may not re-weigh the evidence nor

substitute its judgment for that of the ALJ.  *See Casias v. Secretary of Health & Human Servs.*, 933

F.2d 799, 800 (10th Cir. 1991) (citing *Jozefowicz v. Heckler*, 811 F.2d 1352, 1357 (10th Cir. 1987)).

However, reversal may be appropriate when the ALJ either applies an incorrect legal standard or

fails to demonstrate reliance on the correct legal standards.  *See Winfrey v. Chater*, 92 F.3d 1017,

1019 (10th Cir. 1996).

## VI. ISSUES ON APPEAL

On appeal, Plaintiff alleges the following issues: (1) the ALJ failed to properly assess

whether plaintiff's mental disorders persisted for the requisite period of twelve months; (2) the ALJ

did not properly weigh the conflicting opinions of mental impairments; (3) the ALJ failed to

properly weigh the conflicting medical opinions of plaintiff's physical impairments; (4) the ALJ

failed to weigh the opinion of the agency physician, Dr. Ketelhohn; and (5) the ALJ's finding that

Plaintiff's testimony is not entirely credible is not sufficient.

## VII. ANALYSIS

The Court will address each of Plaintiff's issues in turn.

**A.     Whether ALJ Properly Assessed Duration of Plaintiff's Mental Condition**

The ALJ in this case considered Plaintiff's alleged depression to be "situational in nature and

resulting from several events .... She had no long standing history of mental health treatment or

conditions." [AR 17]   In so determining, the ALJ first noted there was nothing in the record

substantiating Dr. Neece's finding that Plaintiff's depression began in 2008, then found that Plaintiff

was first assessed for mental heath treatment by Spanish Peaks in July 2012.   He then concluded, "Since this condition is not durational in nature, no substantive evidence shows that she has any long-standing mental health concerns and she is effectively treated with medication and therapy, the undersigned finds this to be a non-severe impairment and gives great weight to the opinion of Mary Ann Wharry, Psy.D. [who] characterized her depression as not severe." [AR 18].

Pursuant to 20 C.F.R. § 404.1520(a)(4)(ii), at the second step of the sequential evaluation process, an ALJ is required to determine whether a medically determinable impairment may be classified as severe and whether such impairment meets the duration requirement of 42 U.S.C. § 423(d)(1)(A), which provides:

(1) The term "disability" means--

(A) inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

Here, Plaintiff argues that the ALJ erred by finding "no substantive evidence shows that [Plaintiff] has any long-standing mental health concerns," since the medical record indicates that Plaintiff had been suffering depression and anxiety "for well over twelve months."   Plaintiff specifically points to the ALJ's reliance on Dr. Wharry's speculative finding on August 31, 2011, based on records from January 2011, that Plaintiff's depression over her daughter's death would not last a year from the disability onset date of April 30, 2011.   Opening Brief, docket #14 at 10-11. However, Plaintiff contends, her mental impairments persisted longer than Dr. Wharry predicted as indicated by the medical record.

Defendant counters that any error by the ALJ in failing to find Plaintiff's mental impairment met the durational requirement became harmless when the ALJ considered the impairment in assessing Plaintiff's RFC. Plaintiff replies that the ALJ specifically excluded any mental impairments from his RFC analysis due to the durational issue by finding "no substantive evidence" of the impairments in the record and by his reliance on Dr. Wharry's speculative finding about Plaintiff's depression.

There is no dispute in this case that Plaintiff's depression and anxiety are medically determinable impairments. The Court agrees with the Plaintiff in part and finds that the ALJ erred in concluding Plaintiff's mental impairments are "not severe" due to a lack of the durational requirement. First, the ALJ was incorrect in finding no substantive evidence of Plaintiff's "long-standing" depression/anxiety in the record. The ALJ's decision is vague in this regard; without specifying a date, the ALJ notes Plaintiff "sought treatment for depression, which was situational in nature and resulting from several events, the loss of her father, the sudden death of her daughter and an accident resulting in [severe injuries to] her son." It is unclear whether the ALJ derived this information from January 2011 records in which the Plaintiff first reported her daughter's death in November 2010 and the depression she suffered, from September 2011 records in which Plaintiff reported "stress" from the hospitalization of her father, or from July 2012 records in which Plaintiff reported issues surrounding the deaths of her daughter and father, as well as her son's automobile accident.

In any case, it is clear from the record that Plaintiff was treated with medication and/or counseled for depression/anxiety in October 2010 [AR 267-271]; January 2011 [AR 244]; May 2011

[AR 365]; June 2011 [AR 362, 363]; July 2011 [AR 361]; August 2011 [AR 386-388]; September 2011 [AR 395-401; 483], October 2011 [AR 405-409; 414; 422-424; 481], November 2011 [AR 442-447; 510]; December 2011 [AR 449-450]; March/April 2012 [AR 490, 506]; May 2012 [AR 505]; June 2012 [AR 504];  then, July 2012 through January 2013 with Spanish Peaks. There is no indication in these records, particularly in those from Kaiser Permanente dated October 2010 through December 2011, that Plaintiff's medications for her mental impairments were discontinued. Accordingly, the ALJ's finding that Plaintiff's mental impairments were not "durational in nature" at Step 2 is not supported by substantial evidence in the record.

Second, the Court disagrees with the Defendant that the ALJ considered Plaintiff's mental impairments in his RFC analysis and, thus, the ALJ's error was not harmless.  Although the ALJ discusses Dr. Neece's findings concerning Plaintiff's mental impairments in his RFC analysis, he mentions nothing about Plaintiff's treatment for depression and anxiety at Kaiser Permanente from approximately October 2010 through December 2011 and at Spanish Peaks from July 2012 through approximately January 2013.  More importantly, at the initial hearing on October 2, 2012, the ALJ noted the inconsistencies in Dr. Neece's findings regarding not only Plaintiff's physical impairments, but also her mental impairments [AR 42-43]; however, the ALJ ordered a follow-up consultative evaluation only for her *physical* impairments [AR 44].  Then, at the March 11, 2013 hearing, the ALJ took no testimony from the Plaintiff or anyone else regarding Plaintiff's mental impairments.  As noted herein, the ALJ's RFC contains no limitations concerning Plaintiff's mental impairments.

The Court concludes that the ALJ's finding at Step 2 that Plaintiff's medically determinable

mental impairments were not severe because they were not "durational in nature" is not supported

by the record and, thus, the decision must be remanded to the Commissioner.

**B.      Whether the ALJ Properly Weighed Conflicting Mental Health Opinions**

As set forth above, the ALJ determined, "Since [Plaintiff's depression] is not durational in

nature, no substantive evidence shows that she has any long-standing mental health concerns and

she is effectively treated with medication and therapy, the undersigned finds this to be a non-severe

impairment and gives great weight to the opinion of Mary Ann Wharry, Psy.D. [who] characterized

her depression as not severe." [AR 18] On the other hand, the ALJ found the following with respect

to Dr. Neece's opinions of Plaintiff's mental health:

> Dr. Neese completed [ ] mental and physical residual functional capacity evaluations
> on September 5, 2012.  Mentally, he expressed the opinion that the claimant had
> depression and anxiety, [and he] had treated her from May of 2012 to the present.
> Her symptoms included loss of interest and low self-esteem. He expressed the
> opinion that she had moderate limitations in the ability to understand and remember
> detailed instructions, the ability to maintain attention and concentration for extended
> periods and the ability to perform activities within a schedule, maintain regular
> attendance and be punctual within customary tolerances among others.  He also
> opined that she had marked limitations in the ability to complete a normal workday
> or workweek without interruptions from psychologically based symptoms and that
> she would be off task 30% of the week.  His ratings were based on clinical exam
> findings and he expressed that she had this level of mental impairment since 2008
> (10F/3).  The undersigned gives no weight to Dr. Neece's opinions regarding her
> mental health.  This provider has no expertise in the area of mental health and it is
> not clear how he arrived at the conclusions he did, especially given that there are no
> objective or clinical findings to support the mental limitations assigned.

[AR 20-21] The ALJ then listed a number of reports and records by Dr. Neece which appear to list

different disability onset dates.  The ALJ concluded, "The undersigned finds that [Dr. Neece's]

reports are far from credible due to the plethora of inconsistent statements regarding the severity of

the claimant's conditions and the onset dates. Consequently, no weight is given Dr. Neece's opinions regarding the claimant's physical or mental functioning or limitations." [AR 21]

Plaintiff argues that the ALJ failed to perform the required two-step assessment of a treating physician's opinion by first failing to determine whether Dr. Neece's opinions were entitled to controlling weight. She further contends that the ALJ's reasons for rejecting Dr. Neece's opinions do not warrant total rejection under the law, and the ALJ had no valid reason for elevating Dr. Wharry's opinion over Dr. Neece's.

Defendant counters that while the ALJ did not specify whether he gave Dr. Neece's opinion controlling weight, he specified the weight he gave and the reasons therefor, which are sufficient to affirm. Defendant also contends that the record demonstrates Plaintiff received "sporadic treatment" for her "situational" mental problems and, thus, the ALJ's greater weight given to Dr. Wharry was reasonable.

Plaintiff replies that, of course, a rejection implies the ALJ denied the physician controlling weight, but in this case, the ALJ's failure to state reasons for denial of controlling weight prevent the Court from reviewing whether the ALJ improperly rejected Dr. Neece's opinion for reasons that should have only denied controlling weight. Plaintiff contends that the ALJ must expressly state why he denied controlling weight so the Court would be able to review whether a deficiency (in one of the two controlling weight factors) merely precludes controlling weight, or whether it can be used to reject the opinion. Specifically, here, Plaintiff contends that one of the ALJ's reasons for rejecting Dr. Neece – lack of "objective or clinical findings to support the mental limitations assigned" – may be proper for declining to give an opinion controlling weight, but improper for

26

rejecting the opinion altogether.  In addition, Plaintiff argues the ALJ's other reason for rejecting the opinion – Dr. Neece "has no expertise in the field of mental health" – is merely speculative, since the record contains no evidence to support such reason.  Finally, Plaintiff repeats her arguments that the ALJ improperly gave greater weight to Dr. Wharry, a non-treating agency physician, who never saw the Plaintiff and who issued an opinion without seeing all of the mental health records.

According to the "treating physician rule," the Commissioner will generally "give more weight to medical opinions from treating sources than those from non-treating sources." *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c)(2).  In fact, "[a] treating physician's opinion must be given substantial weight unless good cause is shown to disregard it." *Goatcher v. U.S. Dep't of Health & Human Servs.*, 52 F.3d 288, 289-90 (10th Cir. 1995).  A treating physician's opinion is accorded this weight because of the unique perspective the doctor has to medical evidence that cannot be obtained from an objective medical finding alone or from reports of individual examinations.  *See Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004).

When assessing how much weight to give a treating source opinion, the ALJ must complete a two-step inquiry, each step of which is analytically distinct.  *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011).  The ALJ must first determine whether the opinion is conclusive – that is, whether it is to be accorded "controlling weight" on the matter to which it relates.  *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003); *accord Krauser*, 638 F.3d at 1330.  To do so, the ALJ:

> must first consider whether the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques. If the answer to this question is 'no,' then the inquiry at this stage is complete. If the ALJ finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record. [...] [I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight.

*Watkins*, 350 F.3d at 1300 (applying Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *2) (internal quotation marks and citations omitted); *accord Mays v. Colvin*, 739 F.3d 569, 574 (10th Cir. 2014); *see also* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

If, however, a treating physician's opinion is not entitled to controlling weight, the ALJ must proceed to the next step, because "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527." *Watkins*, 350 F.3d at 1300; *see also Mays*, 739 F.3d at 574.   At the second step, "the ALJ must make clear how much weight the opinion is being given (including whether it is being rejected outright) and give good reasons, tied to the factors specified in the cited regulations for this particular purpose, for the weight assigned." *Krauser*, 638 F.3d at 1330.  If this is not done, remand is mandatory. *Id.*  As SSR 96-2p explains:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in [§§] 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* (citing SSR 96-2p, 1996 WL 374188, at *4).  Hence, the absence of a condition for controlling

weight raises, but does not resolve the second, distinct question of how much weight to give the opinion. *Krauser*, 638 F.3d at 1330-31 (citing *Langley*, 373 F.3d at 1120) (holding that while absence of objective testing provided basis for denying controlling weight to treating physician's opinion, "[t]he ALJ was not entitled, however, to completely reject [it] on this basis")). In weighing the opinion, the ALJ must consider the following factors:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Id.* at 1331. In applying these factors, "an ALJ must 'give good reasons in the notice of determination or decision' for the weight he ultimatel[y] assign[s] the opinion." *Watkins*, 350 F.3d at 1300 (quoting 20 C.F.R. § 404.1527(d)(2)); *see also* SSR 96-2p, 1996 WL 374188, at *5; *Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003). Without these findings, remand is required. *Watkins*, 350 F.3d at 1300–01; *accord Krauser*, 638 F.3d at 1330. Finally, if the ALJ rejects the opinion entirely, he must give "specific, legitimate reasons" for doing so. *Watkins*, 350 F.3d at 1301.

Here, Defendant contends, and the Court agrees, it can infer from the ALJ's opinion that he declined to give Dr. Neece's mental health opinions controlling weight based on the ALJ's finding that "there are no objective or clinical findings to support the mental limitations assigned." *See Mays*, 739 F.3d at 575 (where the ALJ concluded a treating physician's opinion "was not consistent with the objective medical evidence," the ALJ "implicitly declined to give the opinion controlling

weight").

However, the inquiry does not stop there. *See Krauser*, 638 F.3d at 1330-31 (citing *Langley*, 373 F.3d at 1120) (holding that while absence of objective testing provided basis for denying controlling weight to treating physician's opinion, "[t]he ALJ was not entitled, however, to completely reject [it] on this basis")). Once finding that the opinion was not controlling, the ALJ was required to consider what weight to assign based upon the factors set forth in *Krauser, et al.* Here, the ALJ gave Dr. Neece's opinions no weight based on the additional reasons that Dr. Neece has "no expertise in the area of mental health" and "his reports are far from credible due to the plethora of inconsistent statements regarding the severity of the claimant's conditions and the onset dates." [AR 21] The Court construes these reasons as implicating factors (3), (4) and (5); however, there is no indication in the decision that the ALJ addresses factors (1) and (2). *See Robinson*, 366 F.3d at 1082 ("Even if a treating physician's opinion is not entitled to controlling weight, treating source medical opinions are still entitled to deference and must be weighed using *all* of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927.") (internal quotations and brackets omitted) (emphasis added); *see also Krauser*, 638 F.3d at 1330 (citing SSR 96-2p, 1996 WL 374188, at *4).

Moreover, the reasons the ALJ gives for rejecting Dr. Neece's opinions must be "specific" and "legitimate." *Watkins*, 350 F.3d at 1301. Plaintiff contends that the ALJ's stated reason, Dr. Neece "has no expertise in the area of mental health," is speculative and not supported by the record. The Court must agree; although Dr. Neece does not set himself out as an "expert" in mental health, the record is actually unclear as to what training and experience Dr. Neece may have in mental health diagnoses and treatment. Nevertheless, there is nothing in the record supporting the ALJ's

conclusion and, as stated above, while the ALJ determined to clarify Plaintiff's *physical* limitations based on Dr. Neece's reports, he did nothing to clarify Plaintiff's *mental* limitations, if any; accordingly, the Court must find the conclusion is speculative at best.   *See Robinson*, 366 F.3d at 1082 (quoting *McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002)) ("In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion.").

As for the ALJ's other reason for rejecting the opinion – Dr. Neece's reports are inconsistent and lack credibility – the ALJ came to this conclusion following a discussion primarily of the Plaintiff's physical impairments.  [AR 21]  Nevertheless, it appears that the ALJ discussed two of Dr. Neece's reports concerning Plaintiff's mental impairments, one dated September 5, 2012 [AR 498-500] and another undated report [AR 569-570]. [*See* AR 20-21] These reports do not appear to be inconsistent with each other or with the record.  The undated report states that Plaintiff had been treated by a psychiatrist and started on Prozac in 2004, and the September 2012 report states that the doctor's noted severity levels of Plaintiff's mental impairments had lasted since 2008.  To the extent the ALJ construed 2004 and 2008 as inconsistent "onset dates," the ALJ is incorrect.  Moreover, the undated report states that Plaintiff "also attended counseling. Has records with Kaiser Permanente. At this time she attends counseling at Spanish Peaks Mental Health. Also receives Xanax for anxiety." [AR 569] As set forth above in the previous section, all of these statements are supported by the medical record.  Likewise, the September 2012 report, on which (as the ALJ found) Dr. Neece expressed mental impairment limitations based on clinical examination findings, stated he

had been treating Plaintiff since May 2012 for depression and anxiety; these statements are also supported in the record through his own examinations in May and June 2012 [AR 504-505] and by his referral of the Plaintiff to Spanish Peaks Behavioral Health Center in July 2012 [*see* AR 555].

Although not required to do so, the ALJ also noted two Med-9 forms completed by Dr. Neece; the ALJ asserted an "inconsistency" in two different disability onset dates listed on the first pages of these forms, but the Court sees that the portions actually completed by the doctor on the second pages of the forms both denote "5-1-11" as the disability onset date.  [Compare AR 489-490 with AR 564-565; *see also* AR 491-492]  Consequently, the Court finds no inconsistencies in any of Dr. Neece's mental health reports reviewed by the ALJ, either with the record or with each other. Thus, the ALJ's reasons for rejecting Dr. Neece's opinions appear to be neither "good" nor "legitimate."

Finally, Plaintiff challenges the ALJ's assignment of "great weight" to Dr. Wharry's opinion. Typically, the opinion of a treating physician is "given more weight over the views of consulting physicians or those who only review the medical records and never examine the claimant." *Robinson*, 366 F.3d at 1084 (internal quotation marks omitted). "[A]n agency physician who has never seen the claimant is entitled to the least weight of all." *Id.*  But the opinion of a State agency psychologist

> may be entitled to greater weight than a treating source's medical opinion if the State agency ... psychological consultant's opinion is based on a review of a *complete* case record that includes a medical report from a specialist in the individual's particular impairment which provides more detailed and comprehensive information than what was available to the individual's treating source.

SSR 96-6P, 1996 WL 374180, at *3 (emphasis added).

In this case, the ALJ did not discuss Dr. Wharry's opinion but summarily assigned it "great weight" after finding insufficient duration, no long-standing concerns, and effective treatment of Plaintiff's  mental health impairments. [AR 18] The Court finds this assignment to be unsupported by substantial evidence in the record.  Dr. Wharry's opinion was issued in August 2011 at the time Plaintiff's disability claims were first denied; accordingly, Dr. Wharry's review was not based on a complete record.  Moreover, the record she reviewed did not include a medical report from a mental health specialist providing more detailed and comprehensive information than that available to Dr. Neece.  Consequently, the ALJ's reasons for giving more weight to Dr. Wharry than to Dr. Neece are not supported by the record.

The ALJ erred in failing to address all of the regulatory factors in determining the weight to give Dr. Neece's mental health opinions, failing to give "good" and "legitimate" reasons for rejecting Dr. Neece's opinions, and giving greater weight to Dr. Wharry's mental health opinion. Therefore, the Court must reverse the decision and remand for further consideration and/or clarification.

**C.     Whether the ALJ Properly Weighed Conflicting Physical Health Opinions**

For this issue, the Plaintiff actually challenges the ALJ's decisions regarding two physicians who treated Plaintiff for her physical impairments, rather than identifies any "conflicting" opinions. The Court will address each challenged opinion.

1.     <u>Dr. Neece</u>

Like the arguments raised in Section B, the Plaintiff contends the ALJ failed to follow the sequential two-step inquiry with regard to Dr. Neece's opinions concerning Plaintiff's physical

impairments.   Again, the Court finds the ALJ implicitly declined to give Dr. Neece's opinions controlling weight by finding his reports were "not supported by any objective medical evidence." [AR 21] As for the second step, the ALJ gave no weight to Dr. Neece's opinions and, thus, the Court must determine whether, based on the regulatory factors, the ALJ's reasons are "good," "specific" and "legitimate."

As with the doctor's mental health reports, the ALJ determined Dr. Neece's physical health reports "are far from credible due to the plethora of inconsistent statements regarding the severity of the claimant's conditions and the onset dates." [AR 21] The Court construes these reasons as implicating factors (3) and (4); however, there is no indication in the decision that the ALJ addresses factors (1), (2), (5) or (6) (if any).  *See Robinson, supra.*

The ALJ cited two reports by Dr. Neece, the first dated September 5, 2012 that includes a January 8, 2013 supplement, and the second undated.  Regarding the September 5, 2012 report and supplement, the ALJ did not explain and the Court cannot discern any "inconsistent statements regarding the severity of the claimant's conditions."  To the extent the report itself contains vague references, they are explained in the supplement, and the ALJ failed to specify otherwise.

Regarding the second report, the Court agrees that, due to the omission of a date, it is unclear whether there may be inconsistencies in Dr. Neece's severity statements, or whether, simply, the Plaintiff's conditions had changed during a certain time period.  In any event, to the extent material information was missing from the record, it was incumbent upon the ALJ to contact Dr. Neece to attempt to obtain this information so to develop a complete record.  *See* 20 C.F.R. § 404.1512(d); *see also Fleetwood v. Barnhart*, 211 F. App'x 736, 741 (10th Cir. 2007) ("When evidence from the

claimant's treating doctor(s) is inadequate to determine if the claimant is disabled, the Commissioner must contact the treating doctor(s) to determine if additional needed information is available.").

Instead, the ALJ determined to arrange a consultative examination of the Plaintiff for her physical impairments. [AR 44] Certainly, the ALJ was authorized to do so; however, such examination is typically ordered only after the SSA is unable to obtain the needed information from the treating source. *See* 20 C.F.R. § 404.1512(d)(1) and (e). And, ordering the examination, in itself, did not relieve the ALJ from providing "good," and "legitimate" reasons for rejecting Dr. Neece's opinions regarding Plaintiff's physical impairments.

The Court concludes the ALJ erred by failing to consider all of the regulatory factors for a treating physician's opinion, and the ALJ's decision to give no weight to Dr. Neece's opinions regarding Plaintiff's physical impairments is not supported by substantial evidence in the record. Thus, the Court must remand to the Commissioner for further consideration and/or clarification.

2.    Dr. Rheaume

The ALJ found the following with respect to Plaintiff's podiatrist, Gordon Rheaume, DPM:

> The claimant's podiatrist characterized her neuropathy as severe (9F, 14F). Gordon Rheume [sic], DPM, completed a form on March 8, 2013 indicating that he provided medical treatment to the claimant for her diabetic neuropathy. He limited the claimant to walking only 30 minutes at a time due to her diabetic neuropathy and could work from one to two hours on her feet during an eight-hour workday if done in 30 minute increments. The objective medical findings sited [sic] that supported the restrictions were, "patient complains of neuropathy, cannot stand or walk long distances, hard to feel gas and brake pedals to drive." (18F). From the record, it appears that Dr. Rheume only saw the claimant on three occasions. While he characterized her neuropathy as severe, it appears that he based the opinion on the claimant's subjective reports versus his own objective findings. The undersigned gives this opinion some weight and finds that it is consistent with a functional limitation that the claimant should only occasionally he exposed to unprotected

heights due to neuropathy in her feet, potentially causing gait instability.

[AR 19-20]  Plaintiff contends that the ALJ erred in failing to complete the two-step inquiry for treating physicians and in providing improper reasons for giving only "some weight" to the doctor's opinion.  Defendant counters arguing Dr. Rheaume is "not a treating physician," and the Tenth Circuit has repeatedly affirmed discounting a doctor's opinion based merely on a claimant's subjective beliefs.  Plaintiff replies that Defendant improperly makes a *post hoc* argument regarding Dr. Rheaume's treating physician status and inconsistently promotes the ALJ's decision regarding Plaintiff's subjective beliefs despite the ALJ's finding that Plaintiff's neuropathy is a severe medically determinable impairment.

First, the Court agrees that the ALJ neither challenged, nor even mentioned, whether Dr. Rheaume was a treating physician merely because he saw the Plaintiff 2-3 times over the relevant period.  He did not question whether Dr. Rheaume treated the Plaintiff for neuropathy; accordingly, it appears that the ALJ properly considered Dr. Rheaume a treating physician.  And, as with Dr. Neece, the Court finds the ALJ implicitly declined to give Dr. Rheaume's opinion controlling weight by finding his report was "based ... on the claimant's subjective reports versus his own objective findings."  *See Mays*, 739 F.3d at 575.  Accordingly, the ALJ was required to proceed to step 2 to determine what weight to assign Dr. Rheaume's opinion using all regulatory factors.

The ALJ gave Dr. Rheaume's opinion "some" weight because the doctor "only saw the claimant on three occasions" and "based the opinion on the claimant's subjective reports versus his own objective findings." [AR 19-20]  The Court construes these reasons as implicating factors (1), (2) and (3); however, there is no indication in the decision that the ALJ addresses factors (4), (5) or

(6) (if any).  *See Robinson, supra.*

In defining a "treating source," the SSA provides, "We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s)."  20 C.F.R. § 404.1502.  In concluding that the Plaintiff saw Dr. Rheaume, a podiatrist, "only" three times between August 2012 and March 2013 [AR 493-494; 538; 568], the ALJ made no mention whether seeing a podiatrist three times over the course of seven months is "typical" or whether it would be in this case.  Moreover, the ALJ failed to explain his rationale for discounting Dr. Rheaume's opinion characterizing Plaintiff's neuropathy as severe based "on the claimant's subjective reports," when the ALJ himself characterized the Plaintiff's neuropathy as severe.  The ALJ's conclusion in this instance also appears to contradict the doctor's exam notes [AR 493; 538] and, perhaps, the ALJ's notation concerning "monofilament tests" [AR 19].

The Court concludes the ALJ erred by failing to consider all of the regulatory factors for a treating physician's opinion, and the ALJ's decision to discount Dr. Rheaume's opinion is not supported by substantial evidence in the record.  Thus, the Court must remand to the Commissioner for further consideration and/or clarification.

**D.     Whether the ALJ Improperly Failed to Weigh the Agency Physician's Opinion**

Plaintiff contends that the ALJ failed to weigh the opinion of the agency physician, Dr. Ketelhohn. [*See* AR 69]  Defendant counters that any error is harmless because "even if the ALJ had given the doctor greater weight, [Plaintiff] still would not be disabled."  Response, docket #15 at 17.  Plaintiff replies that had the ALJ even considered Dr. Kelehohn's more restrictive opinion, he may

have come to different conclusions about Plaintiff's credibility or the adoption of Dr. Neece's opinions. Plaintiff asserts that SSA's regulation make consideration of all physician's opinions mandatory.

It is undisputed in this case that the ALJ failed to weigh, or even to mention, Dr. Ketelhohn's opinion. However, "[a]n ALJ must evaluate every medical opinion in the record." *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004) (citing 20 C.F.R. § 404.1527(d)); *see also* 20 C.F.R. § 416.927(c). Furthermore, the social security regulations state that, unless the treating source opinion is given controlling weight (which did not occur here), the ALJ "must" explain in the decision the weight given to the opinions of state agency medical or psychological consultants. 20 C.F.R. § 404.1527(e)(2)(ii). The social security rulings require that an ALJ "may not ignore [the opinions of state agency consultants,] and must explain the weight given to these opinions in their decisions." SSR 96-6P, 1996 WL 374180, at *1 (July 2, 1996).

In failing to even mention Dr. Ketelhohn's opinion in his decision, it is clear that the ALJ did not satisfy these requirements. The parties and the Court can only speculate as to how the ALJ may have considered the other evidence in the case if he had taken Dr. Ketelhohn's opinion under consideration. Therefore, the Court must remand the decision to the Commissioner for further consideration. *See Threet v. Barnhart*, 353 F.3d 1185, 1192 (10th Cir. 2003) (failure to consider all relevant evidence in accordance with the regulations necessitates remand).

E.     **Whether the ALJ Sufficiently Found the Plaintiff's Testimony Not Entirely Credible**

Plaintiff argues that the ALJ's "credibility finding is far too conclusory (or even boilerplate) to provide any significant assistance in determining which parts of plaintiff's testimony are credible

and which are not."  Opening Brief, docket #14 at 46.  Because the Court remands the ALJ's decision for further consideration and clarification as to missing information and application of the law, the agency physician's opinion on Plaintiff's physical impairments and the weight of certain doctor's opinions, the Court need not decide whether the ALJ's credibility analysis is flawed. Rather, the Court directs that, upon remand, the ALJ re-evaluate Plaintiff's credibility after fully considering all relevant evidence and applying the correct legal standards.  *See Fleetwood*, 211 F. App'x at 741.

### CONCLUSION

In sum, the Court must conclude that the ALJ's decisions to find Plaintiff's mental impairments "not severe" based on duration, to reject Dr. Neece's opinions concerning Plaintiff's mental and physical impairments, and to discount Dr. Rheaume's opinion concerning Plaintiff's neuropathy are not supported by substantial evidence in the record as a whole.  Further, the ALJ failed to apply the correct legal standards in omitting any consideration of the agency physician's opinion concerning Plaintiff's physical impairments.  Upon remand, the Court directs the Commissioner to reconsider the decision in light of these deficiencies and to reassess the Plaintiff's credibility based on any new findings.

Therefore, the decision of the ALJ that Plaintiff Michelle Vasquez was not disabled is **REVERSED AND REMANDED** to the Commissioner for further consideration and/or clarification in accordance with this order.

Dated at Denver, Colorado this 11th day of March, 2015.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge